IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
1:24-cv-00242-WCM

| | |
|---|---|
| SAVANNAH ABERCROMBIE, ) | |
| ) | |
| Plaintiff, ) | MEMORANDUM OF |
| ) | DECISION AND ORDER |
| v. ) | |
| ) | |
| CAROLINA SPEECH AND HEARING, ) | |
| INC.; ROB SCHULTZ; and ) | |
| MICHELE SCHULTZ, ) | |
| Defendants. ) | |
| _____ ) | |

This matter is before the Court on Defendants' Motion for Summary
Judgment (Doc. 28).

## I.    Procedural Background

On or about August 23, 2024, Savannah Abercrombie ("Plaintiff"),
appearing *pro se*, filed her Complaint against Carolina Speech and Hearing,
Inc. ("Carolina Speech"), Rob Schultz, and Michele Schultz (collectively,
"Defendants") in the Superior Court of Buncombe County, North Carolina. Doc.
1-1.

On September 19, 2024, Defendants removed the matter to this Court.
Doc. 1.

On December 11, 2024, the parties filed a Joint Stipulation of Consent
to Exercise Jurisdiction by a United States Magistrate Judge. Doc. 11. The

1

undersigned was assigned as the presiding judicial officer the following day. Doc. 12.

On October 2, 2025, Defendants filed the Motion for Summary Judgment, accompanied by a supporting memorandum and various exhibits. Docs. 28, 29.

On October 30, 2025, Plaintiff filed an Opposition to the Motion for Summary Judgment that was also accompanied by various exhibits. Doc. 37.

Defendants replied on November 6, 2025. Doc. 39.

On November 12, 2025, Plaintiff filed a Motion for Leave to File Sur-Reply (the "Motion for Leave," Doc. 41).

A hearing on the Motion for Summary Judgment was conducted on December 15, 2025. At the beginning of the hearing, and in consideration of Plaintiff's *pro se* status, the Court granted the Motion for Leave. Following the parties' presentations, the undersigned took the Motion for Summary Judgment under advisement.

On December 29, 2025, Plaintiff filed a Notice of Supplemental Authority. Doc. 45.

## II.  Legal Standard

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a

2

matter of law." Fed. R. Civ. P. 56(c). "As the Supreme Court has observed, 'this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.'" Bouchat v. Baltimore Ravens Football Club, Inc., 346 F.3d 514, 519 (4th Cir. 2003) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986)).

A genuine issue of material fact exists if a reasonable jury considering the evidence could return a verdict for the nonmoving party. Shaw v. Stroud, 13 F.3d 791, 798 (4th Cir. 1994). "Regardless of whether he may ultimately be responsible for proof and persuasion, the party seeking summary judgment bears an initial burden of demonstrating the absence of a genuine issue of material fact." Bouchat, 346 F.3d at 522. If that showing is made, the burden then shifts to the non-moving party, who must convince the court that a triable issue does exist. Id.

In considering the facts on a motion for summary judgment, a court will view the pleadings and material presented in the light most favorable to the nonmoving party. Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587–88 (1986); Scott v. Harris, 550 U.S. 372, 380 (2007) ("At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party.").

3

### III. Factual Background

Viewed in the light most favorable to Plaintiff, the facts presented are as follows:

Rob and Michele Schultz are the owners of Carolina Hearing. Doc. 29-2 at 1; 29-4 at 1. Shivani Patel is the Managing Director. Doc. 29-2 at 1.

Plaintiff was employed as a Patient Care Coordinator ("PCC") in Carolina Hearing's Asheville office beginning on October 31, 2023. Doc. 29-2 at 2.[1] Plaintiff's immediate supervisor was Shelby DeWyse. <u>Id</u>. Claire Hug, Au.D., was the audiologist in the Asheville office. <u>Id</u>. Danielle Harper was the Clinical Director. Doc. 29-5.

At the beginning of each month, Ms. DeWyse provided short updates regarding employees in Carolina Hearing's various locations to Rob Schultz, Michele Schultz, Shivani Patel, and Danielle Harper (the "Email Updates").

In Email Updates made between November 1, 2023 and February 1, 2024, Ms. DyWyse made the following comments regarding Plaintiff:

> Although she has only been with us for one day, Stavi has already shown great promise, and I'm excited for her to take charge of this office.
>
> Doc. 37-2 at 7 (November 1, 2023)

---

[1] Plaintiff's resumé indicates that she was employed by Carolina Hearing as a guest service associate from August of 2022 to October 2023, Doc. 29-6, but Plaintiff's declaration states that this was a typographical error. Doc. 37-3 at 3.

Savannah "Stavi" Abercrombie in Asheville has been with us just under a month now, and she has come a long way. Her scripting is impeccable, and she is excited about the job. Hearing aids were a source of struggle for her but she has really taken them [sic] time to get comfortable with the process.

Doc. 37-2 at 8 (December 6, 2023)

Savannah "Stavi" Abercrombie (Asheville): Motivated and making progress; addressing the high no-show rate.

Doc. 37-2 at 9 (January 3, 2024)

Savannah "Stavi" Abercrombie (Asheville): Her no-show rate was concerning, and we've adjusted her patient call timings. I'm documenting concerns and plan to discuss her day-to-day schedule in an upcoming meeting.

Doc. 37-2 at 10 (February 1, 2024).[2]

On March 7, 2024, Ms. DeWyse sent an email to Carolina Hearing "staff" regarding a new "executive assistant to management" position in the company (the "March 7 Email," Doc. 37-2 at 12). The March 7 Email noted that the "current performance" of individuals who chose to apply for the position would be considered – "[m]eaning sneaking out of the office early, not doing journal entries, and lack of notice of needing time off may be brought up..." Id. The email also advised staff that they should refrain from using cell phones at their

_____

[2] With respect to this last email, Plaintiff points out that Ms. DeWyse also noted generally that no shows "were alarmingly high across all our offices." Plaintiff therefore argues that "this was a company-wide issue, not unique to Plaintiff." Doc. 37 at 2.

desks, that extended personal phone calls, texting, or streaming videos during work hours was prohibited, and that the use of AirPods while working was considered unprofessional. Doc. 37-2 at 13.

In a chat message to Plaintiff the same day, Ms. DeWyse appeared to advise Plaintiff that she (Ms. DeWyse) was about to send out the March 7 Email but that the criticisms in it were not directed at Plaintiff. Dov. 37-2 at 16 (referring to a "a pretty harsh email to everyone IT IS NOT directed at you.").

In March of 2024, Plaintiff and two other applicants sent emails to Ms. Patel expressing interest in the position of Executive Assistant (the "Position"). Doc. 29-1 at 2; see also Doc. 37-2 at 1-4.

Following interviews, Ms. Patel recommended, and Michele Schultz approved, one of the other applicants – a white female – for the Position. Id. Plaintiff was informed on March 20, 2024 that she had not been selected.

In an Email Update sent on March 31, 2024, Ms. DeWyse stated:

> Savannah Abercrombie (Asheville): Savannah is very eager to grow within the company, but she has a lot of work to do in her current role. She tends to need a lot of support, and while she is getting better by the day, we still have work to do before considering her for another position. I'm interested to see how Asheville does with all these new providers onboarding.

Doc. 37-2 at 11 (March 31, 2024).[3]

On April 23, 2024, Plaintiff reached out to Ms. DeWyse via Google chat (the "April 23 Chat Message," Doc. 29-8 at 6-7; Doc. 37-2 at 42-44). The April 23 Chat Message began with a discussion of an appointment that had been booked improperly (by someone other than Plaintiff) as a one-hour evaluation instead of a longer appointment. Plaintiff wrote: "that's my bad; it was only booked for an hour so I thought it was just an evaluation." Id.

In response, Ms. DeWyse stated:

> Okay at this point there is no excuse. You have been here long enough. I am trying to be understanding but you asked me for a raise and those things have to be earned. You have to be prepared for the next day. Little things are adding up and its starting to wear on Claire [Dr. Hug].

Plaintiff replied:

> I'm not sure what little things to which you refer.

> I have started doing the paperwork when a fitting is done as a result of the instruction that was conveyed to me (based on your exact words that the new audiologist isn't capable of doing it). When Claire started I was prepared to do [sic] fill out the paperwork then. However, she preferred to do it herself while already in the room with the patient. I was told that whatever system Claire and I agreed to was acceptable.

---

[3] In the same email, Ms. DeWyse also stated that "overall no-show rates decreased in the majority of our offices. They are still higher than I would like, but I do think this is tied to the increased appointment volume." Doc. 37-2 at 11.

7

Every fitting Claire's done since she's been here, the hearing aids charge in a different room and she comes out to get them. As of last Thursday, I was informed that it is now nonnegotiable and I am responsible going forward for going over the purchase agreements with the patient. So I am now able to fill out the purchase agreements within the hour that she is back with them.

Since this was an evaluation and a fitting, the hearing aids would have time to charge while she was conducting the hearing test. The appointment was not booked as Hear.com appointments usually are (and I did not book it), otherwise, the hearing aids would have been charging as soon as I came in.

I make sure that all paperwork is done before her appointments as I'm supposed to. I print it all off the week before with the exception of superbills [sic?] (so that the date of the bill matches the date of their appointment). Every morning I check to make sure nothing has changed. Whether it is the day before or if I come in earlier to do so I consistently strive to make every patient that comes in feel heard and seen and they leave happy due to my customer service.

I work effectively and efficiently. I do my job and I do it well and I do not think it is right to say I am wearing on anyone.

It seems like this might be an unofficial evaluation of my job performance. Can you please be specific and itemize these "little things" to which you are referring.

Plaintiff contends that Ms. DeWyse responded, "Absolutely. I will be there in 15 minutes; please be prepared."

When Ms. DeWyse arrived, she informed Plaintiff that Plaintiff was being sent home and would be paid for the rest of the day. Doc. 37-3 at 4. Ms.

8

DeWyse stood over Plaintiff as she returned to her (Plaintiff's) desk and said "'Okay, you gotta go,' while making a circular motion with her finger, signaling me to hurry up." Plaintiff asserts that this was humiliating. Doc. 37-3 at 4.

Later in the afternoon of April 23, 2024, Plaintiff sent an email to Ms. Patel requesting that her termination be reconsidered or, at least, be categorized as a lay off for purposes of obtaining a reference moving forward (the "April 23 Email," Doc. 29-3 at 3-5; Doc. 37-2 at 37-38). Plaintiff did not assert in that message that she had been discriminated or retaliated against. Rather, Plaintiff stated that she understood North Carolina was an "at will state," and that she was an "at will employee"

\*\*\*

> But that should not mean free reign to terminate someone on a whim when the effects can ripple out and damage their ability to find another job and be able to provide for themselves. Especially when you are young, just out of college, a woman, and a minority. As of right now, I don't know how I am going to pay my rent. In the six months I have been a part of the company, I have excelled at my job. It is evident in the reviews that are left by the patients, the appreciation I have received from Dr. Hug, and even in Shelby heavily encouraging me to apply for the Executive Assistant position.

> I understand that Shelby has had a rough go of it lately and I do emphathize [sic] with her deeply. And while I cannot fully imagine what she is going through, I can somewhat relate in that I just lost my aunt less than a year ago. My grandma's baby sister. A retired army veteran that died as a result of cancer that her

9

doctors believe she developed due to the burn pits she supervised while in active duty. While I emphathize [sic] with Shelby, I do not find it reason enough to warrant my dismissal, and due to the suddenness of this decision I can only assume that my termination is the direct result of the emotional stress that she has been feeling. I requested a list of the issues she was referring to so that I could address anything I am doing wrong.

From the moment she messaged me, there was a certain level of aggression that I feel was not warranted. Then after I was terminated, I attempted to make sure I was not leaving any personal information behind on the laptop and she was very rude and disrespectful. It was unprofessional, and if I can speak plainly, it was just mean. There were patients in the lobby.

I was respectful and professional, while also advocating for myself. I think it is prudent and in the best interest of my job security to ask that my supervisor give me a specific list of things I am falling behind on or dropping the ball with so that I can correct them methodically and so that I can also clarify anything that needs clarification. It is just good communication.

I implore you to investigate my claims. Proof of what I am saying is in mine and Shelby's Google chat conversation from today.

\*\*\*

Doc. 29-3 at 3-4; Doc. 37-2 at 37-38.

Carolina Hearing provided Plaintiff with a formal termination letter dated April 23, 2024 (the "Termination Letter," Doc. 29-3 at 6-7).[4] The

---

[4] The copy of the Termination Letter attached to Defendants' Motion for Summary Judgment is not signed. Plaintiff has attached what appear to be other versions of

Termination Letter asserted that Plaintiff's employment had been terminated for cause based on: (1) her failure to "complete daily tasks" that resulted in a "no-show rate of 14% for the month of January," which, despite being addressed via email on February 1, persisted; (2) her failure to prepare the office for the next day; (3) delay in returning phone calls; (4) HIPAA violations; and (5) her failure to submit an accurate timecard. Doc. 29-3 at 6.[5]

By letter dated April 26, 2024, the North Carolina Division of Employment Security ("NCDES") advised Carolina Hearing that Plaintiff had filed for unemployment benefits. Doc. 29-2 at 3.

On May 16, 2024, an NCDES adjudicator made an initial determination that Plaintiff was disqualified from receiving benefits. Doc. 29-2 at 3. Plaintiff appealed that initial determination. Id.

---

the Termination Letter (also unsigned) to her response in opposition. Doc. 37-2 at 23-31.

[5] In her declaration, Michele Schultz states that Plaintiff was terminated "solely based on her lack of satisfactory job performance," Doc. 29-2 at 4. Ms. Patel similarly states in a declaration that Plaintiff was terminated for reasons including "failure to complete daily tasks, failure to prepare the office for the following day, failure to return phone calls promptly, failure to properly secure patient identifying information, and submission of inaccurate timecards." Doc. 29-5 at 2; see also Doc. 29-9 (declaration of Dr. Hug). In contrast, Plaintiff states in her declaration that she was "never written up, counseled, or warned about any performance issues" during her employment, "received positive feedback from Ms. DeWyse, including direct message where she told me I was doing well" (although Plaintiff also states that, unbeknownst to her, Ms. DeWyse was at the same time telling Rob Schultz and Michele Schultz that Plaintiff's performance was "deficient in vague, non-specific terms." Doc. 37-3 at 3. Plaintiff also states that she kept the office clean and never received any complaints about her workspace from Dr. Hug, Ms. DeWyse, or any patients. Doc. 37-3 at 6.

On June 7, 2024, Dr. Hug submitted a letter to the NCDES regarding the reasons for Plaintiff's termination. ("Dr. Hug's Letter," Doc. 37-2 at 40-41). Dr. Hug's Letter indicated that Plaintiff "frequently left the office for extended periods of time to attend to personal matters and personal phone calls including leaving to take her grandmother's dog to and from the groomer in the middle of the day and calling AT&T during company time to resolve a problem in regards to her apartment's internet," that both Dr. Hug and Ms. DeWyse had to stay late on two occasions to clean and organize the Asheville office, that Plaintiff had failed to shred sensitive documentation with protected health information in a timely manner, that Plaintiff had left "several time-sensitive checks, with personal banking information" in an unsecured drawer, and that Plaintiff had expressed reluctance to fulfill certain job responsibilities (such as handling purchase agreements and delivery statements). Dr. Hug additionally noted that there were numerous complaints from both patients and business partners about the lack of availability to answer the phone or return messages, and that issues arose regarding the availability of staff on Friday. Doc. 37-2 at 41.[6]

_____

[6] Plaintiff states in her declaration that Ms. DeWyse required her (Plaintiff) to dig through a trash can to recover sticky notes with patients' first initials and last names because Ms. DeWyse believed failure to shred the sticky notes could constitute a HIPAA violation. Doc. 37-3 at 5. Plaintiff states that this experience was "humiliating and demeaning." Doc. 37-3 at 6. Plaintiff also contends that a reference by Dr. Hug to Plaintiff's workplace being "filthy" was "false and racially loaded." Doc. 37-3 at 6. It appears that Plaintiff is referring to Dr. Hug's statement, as set out in Dr. Hug's

On June 20, 2024, Plaintiff signed an EEOC Charge of Discrimination. Doc. 29-3 at 8-25. Plaintiff asserted that she had been "subjected to discrimination because of [her] race (African American) and color (Brown) and subjected to retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended." Doc. 29-3 at 9. Plaintiff additionally explained that:

> In or around October 31, 2023, I was hired by [Carolina Hearing] as a Patient Care Coordinator. My work was performed at an excellent level resulting in the store having a 55% increase in positive reviews. As a result, I was awarded bonuses. In addition, I never received any disciplinary actions.
>
> While I was out on leave in or around April 15, 2024 through April 17, 2024, my manager incorrectly booked and labeled an appointment for April 23, 2024, that was not discovered until the morning of the appointment. Through instant messaging, my manager became irritated and snapped at me because she said that I should have prepared for the appointment the day before. In addition, she implied that there were other little things wrong with my performance. After I requested a list of those things that she was referencing, I was retaliated against and terminated without cause in or around April 23, 2024. Caucasian employees not of my protected group who received less positive feedback and reviews were treated more favorably and not discharged. My

---

Letter, that both Dr. Hug and Ms. DeWyse "had to stay late on two occasions, often until 8:00 p.m., after a full workday and coming in early, to address the buildup of filth and disorganization within the office premises." Doc. 29-10 at 1. Plaintiff has not provided persuasive authority to support her position that Dr. Hug's statement that there was a "buildup of filth and disorganization" in the Asheville office was "racially loaded," and, in any event, that statement was made after Plaintiff's termination and after the NCDES adjudicator made an initial determination regarding Plaintiff's entitlement to unemployment benefits.

> employer is unable to explain the difference in treatment.

Doc. 29-3 at 8.

The EEOC issued a Determination and Notice of Rights letter on June 25, 2024. Doc. 29-3 at 13.

On July 1, 2024, an Appeals Referee for the NCDES held a hearing and considered Plaintiff's appeal of the initial determination that she was disqualified for unemployment benefits. See Doc. 29-3 at 14. Following that hearing, and in a letter mailed on July 2, 2024, the Appeals Referee found that Plaintiff had been discharged for unsatisfactory job performance but that Plaintiff had "performed the job to the best of her ability, and she [Plaintiff] received a performance bonus for each quarter she worked for Employer." Doc. 29-3 at 14 & 16. The Appeals Referee also concluded that Plaintiff was not disqualified from unemployment benefits because:

> The Employer has the responsibility to show the Claimant was discharged for misconduct within the meaning of the law. The Claimant was discharged for unsatisfactory job performance. The Claimant did not receive three written warnings for unsatisfactory job performance in the twelve months preceding her termination; therefore the Employer has not established the prima facie elements of misconduct for poor job performance as outlines in subsection (11) of G.S. 96-14.6(c). The Claimant was not given adequate warning that her job performance was unsatisfactory or that her job was in jeopardy; therefore, the Claimant was not discharged for misconduct connected with the work.

14

Doc. 29-3.

No party appealed the Appeals Referee's decision.

## IV. Discussion

In her Complaint, Plaintiff asserts the following claims: (1) violation of Title VII of the Civil Rights Act of 1964 based on (a) a failure to promote Plaintiff; (b) wrongful termination; and (c) alleged retaliation; (2) violation of 42 U.S.C. § 1981 for "employment discrimination: retaliation"; (3) "unemployment benefits fraud" in violation of N.C.G.S. § 96-18.

### A. Title VII Claims

#### 1. Against Rob Schultz and Michele Schultz

Title VII provides, in relevant part, that "[i]t shall be an unlawful employment practice for an employer ... to discriminate against any individual with respect to his ... terms, conditions, or privileges of employment, because of such individual's ... race [or] color." 42 U.S.C. § 2000e-2(a). The Fourth Circuit has explained that Title VII's remedial scheme "clearly indicates a congressional intent to limit plaintiffs' remedies to suits against employers" and that "[t]o permit individual liability would improperly expand the remedial scheme crafted by Congress." Lissau v. S. Food Serv., Inc., 159 F.3d 177, 181 (4th Cir. 1998).

Here, there is no evidence to indicate that either Rob Schultz or Michele Schultz should be considered to be "employers" for purposes of Title VII.

Further, and as discussed below, the undersigned is otherwise persuaded that Plaintiff's Title VII claims are subject to dismissal.

Accordingly, Plaintiff's Title VII claims against Rob Schultz and Michele Schultz will be dismissed.

### 2. Failure to Promote

Plaintiff alleges that the Email Updates "reveal duplicity and a deliberate effort to downplay [her] work performance compared to the White woman who received the promotion." Doc. 1-1 at 13.

Defendants respond that they are entitled to summary judgment on this claim because it is outside the scope of Plaintiff's Charge of Discrimination.

"[A] federal court may only consider those allegations included in the EEOC charge." Balas v. Huntington Ingalls Indus., Inc., 711 F.3d 401, 407 (4th Cir. 2013). While EEOC charges are to be construed liberally, a court is "not at liberty to read into administrative charges allegations they do not contain." Id. at 408. A plaintiff's claim "generally will be barred if his charge alleges discrimination on one basis ... and he introduces another basis in formal litigation...." Chacko v. Patuxent Inst., 429 F.3d 505, 509 (4th Cir. 2005). "Only 'those discrimination claims stated in the initial charge, those reasonably related to the original complaint, and those developed by reasonable investigation of the original complaint may be maintained in a subsequent Title VII lawsuit.'" Stewart v. Iancu, 912 F.3d 693, 705–06 (4th Cir. 2019)

(quoting <u>Chacko</u>, 429 F.3d at 506) and citing <u>Smith v. First Union Nat. Bank</u>, 202 F.3d 234, 247 (4th Cir. 2000).

Here, the Charge of Discrimination did not reference any facts related to Plaintiff's failure to promote claim. Rather, the Charge of Discrimination focused on the events of April 23, 2024 – the incorrectly booked appointment, Plaintiff's request for clarification of the "little things" that Ms. DeWyse stated were adding up, and Plaintiff's termination.[7]

Plaintiff did refer in the Charge to Caucasian employees being treated more favorably, but that assertion pertained to employees who had received "less positive feedback and reviews" than Plaintiff and who were not discharged.

On this record, the undersigned is not persuaded that Plaintiff's failure to promote claim is encompassed by or reasonably related to the Charge of Discrimination.[8] <u>See</u> <u>Batchelor v. City of Wilson</u>, 747 F. Supp. 3d 845, 855 (E.D.N.C. 2024) ("'Thus, a claim in formal litigation will generally be barred if

_____

[7] The Charge of Discrimination references April 23, 2024 as being the earliest and latest dates of discrimination. The Charge asserts discrimination based on "color, race, retaliation." Doc. 29-3 at 8.

[8] While Plaintiff argued during the hearing that she submitted additional materials to the EEOC regarding her failure to promote claim, those materials are not in the record before this Court and, in any event, extrinsic evidence to the filing of an EEOC charge, such as the supporting intake questionnaires and private letters to the EEOC, cannot be used to constructively amend a formal discrimination charge. <u>See</u> <u>Balas</u>, 711 F.3d at 409.

the EEOC charge alleges discrimination on one basis, such as race, and the formal litigation claim alleges discrimination on a separate basis, such as sex.' The same principle applies with respect to a plaintiff who files an EEOC charge with respect to one adverse employment action (such as a failure to promote), but then seeks to expand the formal litigation claim to a separate adverse employment action (such as a termination).") (internal citations omitted); Dennis v. County of Fairfax, 55 F.3d 151, 156–57 (4th Cir. 1995) (hiring, promotion, and training discrimination claims dismissed where EEOC charge alleged only discriminatory discipline); Clement v. Spartanburg Steel Prods., No. 7:19-CV-666-MGL-KFM, 2019 WL 8375931, at *6 (D.S.C. Aug. 19, 2019), report and recommendation adopted sub nom., 2020 WL 702751 (D.S.C. Feb. 11, 2020) ("The plaintiff's charge could have identified a 'discrete act' of a missed promotion. It did not. Further, the plaintiff's failure to promote claim raised in his complaint could not be said to be 'reasonably related to the original complaint of discrimination in the charge' or developed by reasonable investigation' of his charge, as nothing in the charge references any aspect of the defendant's promotion system.").[9]

---

[9] Even if Plaintiff's failure to promote claim was encompassed by or reasonably related to the Charge of Discrimination, as discussed below, the record is devoid of any evidence that Plaintiff was denied the Position because of her race or color.

### 3. Wrongful Termination

Plaintiff alleges that following her termination, she promptly reported Ms. DeWyse's "actions"[10] but that the "company failed to investigate or take action" and instead "deliberately sought to deny [her] critical financial relief by blocking [her] unemployment benefits." Doc. 1-1 at 13.

Title VII makes it an unlawful employment practice for an employer:

> to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

"In order to prove a Title VII wrongful termination claim, an employee may proceed under ordinary principles of proof using direct or indirect evidence, or under the paradigm for indirect proof of employment discrimination set out in McDonnell-Douglas Corp. v. Green, 411 U.S. 792 (1973)." Woodard v. N. Carolina Dep't of Transp., No. 3:06CV264-H, 2007 WL 2682765, at *5 (W.D.N.C. Sept. 7, 2007).[11]

Under the alternative proof scheme established in McDonnell-Douglas, the employee must first establish a prima facie case of discrimination. "The

---

[10] Plaintiff's Complaint indicates that these "actions" surround Ms. DeWyse's comment about "little things" adding up (as stated in the April 23 Chat Message) and Ms. DeWyse "hurry[ing]" Plaintiff out of the building following her termination. See Doc. 1-1.

[11] Here, Plaintiff has presented no direct evidence of employment discrimination.

elements of a prima facie claim of discrimination under Title VII are well established. 'The plaintiff must demonstrate: (1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class.'" Presnell v. Sharp Elecs. Corp., No. 5:21-CV-00107-KDB-DCK, 2022 WL 17683126, at *9 (W.D.N.C. Dec. 14, 2022) (quoting Holland v. Washington Homes, Inc., 487 F.3d 208, 214 (4th Cir. 2007) (citing McDonnell Douglas, 411 U.S. at 802)). If the employee establishes a prima facie case of illegal discrimination, the burden then shifts to the employer to articulate some legitimate, non-discriminatory reason for its employment decision. 411 U.S. at 802. If the employer does so, the presumption of discrimination "drops from the case," and the employee must demonstrate that the employer's stated reason for its action was, in fact, a pretext for improper discrimination. Id. at 804.

Here, Carolina Hearing concedes that Plaintiff is a member of a protected class and that she suffered an adverse employment action. Carolina Hearing argues, though, that (1) Carolina Hearing has demonstrated that Plaintiff's performance was unsatisfactory; and (2) Plaintiff cannot establish that Carolina Hearing's assertion that Plaintiff's job performance was unsatisfactory was pretextual.

With respect to Plaintiff's job performance, Plaintiff has submitted the Email Updates, which indicate that although there were some issues with

Plaintiff's job performance, Plaintiff's work was improving. Doc. 37-2 at 10 (February 1, 2024) ("Her no-show rate was concerning, and we've adjusted her patient call timings. I'm documenting concerns and plan to discuss her day-to-day schedule in an upcoming meeting."); Doc. 37-2 at 11 (March 31, 2024 ("Savannah is very eager to grow within the company, but she has a lot of work to do in her current role. She tends to need a lot of support, and while she is getting better by the day, we still have work to do before considering her for another position. I'm interested to see how Asheville does with all these new providers onboarding.").

Further, Ms. DeWyse's March 7 Email indicates that Ms. DeWyse did not think Plaintiff had an issue with Friday availability (despite Dr. Hug's statement to the contrary), <u>compare</u> Doc. 37-2 at 16 <u>with</u> Doc. 37-2 at 41, and while Ms. DeWyse asserts in her declaration that Plaintiff was previously counseled about Plaintiff's job performance, Plaintiff's declaration says otherwise. <u>See</u> Doc. 37-3 at 3 (Plaintiff's declaration stating that she was never written up, counseled, or warned about any performance issues during her employment" and that she received "positive feedback" during her time at Carolina Hearing).

Consequently, the current record is mixed as to whether Plaintiff's job performance was satisfactory or unsatisfactory.

However, assuming that Plaintiff can establish a prima facie case of discrimination,[12] the undersigned finds that Carolina Hearing has articulated a legitimate, non-discriminatory reason for its employment decision. See Sutherland v. Autumn Corp., 124 F. Supp. 2d 945, 947 (W.D.N.C. 2000), aff'd, 13 F. App'x 111 (4th Cir. 2001) (explaining that "[e]ven assuming arguendo that Plaintiff could establish a prima facie case, the Defendant has articulated a legitimate, non-retaliatory reason for Plaintiff's discharge" through submission of an affidavit from one of the individuals who decided to fire plaintiff setting out various reasons supporting plaintiff's termination).

Accordingly, Plaintiff must demonstrate that Carolina Hearing's stated reason for Plaintiff's termination—Plaintiff's job performance—was a pretext for discriminating against Plaintiff based on her race or color.

On this point, Plaintiff has presented no evidence that would support a finding that Carolina Hearing's reference to Plaintiff's job performance was a pretext for improper discrimination. Plaintiff argued during the hearing that the Court should "infer" that she was fired because of her race because Plaintiff

---

[12] The parties have not focused on whether the evidence of record establishes the fourth element of Plaintiff's prima facie case – that Plaintiff received different treatment from similarly situated employees outside the protected class. Therefore, the undersigned will assume, without deciding, that Plaintiff could establish this element.

22

defended her work performance and was terminated immediately thereafter, but she could not articulate further support for that theory.

Rather, Plaintiff explained during the hearing that she felt that some of her coworkers were treated differently and when the Court asked for a specific example, Plaintiff stated that she could not "fully answer" that question and did not believe there was any physical evidence to which she could point.

Summary judgment in favor of Carolina Hearing on Plaintiff's Title VII claim for wrongful termination is therefore appropriate. See Presnell v. Sharp Elecs. Corp., No. 5:21-CV-00107-KDB-DCK, 2022 WL 17683126, at *9 (W.D.N.C. Dec. 14, 2022) ("even if Presnell had established a prima facie case, the record is devoid of any evidence from which a jury could reasonably conclude that Sharp's decision to terminate her employment for the legitimate non-discriminatory reasons given was a pretext for intentional discrimination based on her sex. Simply put, Presnell has offered no evidence that her sex played any role in her termination or any reason that Sharp would do so. Thus, Sharp is entitled to summary judgment on Presnell's claim of wrongful termination both for failure to prove a prima facie case and pretextual discrimination."); Mbadiwe v. Union Mem'l Reg'l Med. Ctr., Inc., No. 3:05CV49-MU, 2007 WL 1219953, at *2 (W.D.N.C. Apr. 24, 2007), aff'd sub nom. Mbadiwe v. Union Reg'l Med. Ctr., 265 F. App'x 147 (4th Cir. 2008) ("Plaintiff has simply failed to come forward with a shred of evidence that the Defendants' actions

were racially motivated other than his own speculation. In light of the forgoing, it is abundantly clear that Plaintiff has failed to raise a genuine issue of material fact and that judgment in favor of the Defendants is appropriate."); Steward v. Colonial Williamsburg Found., No. CIV.A. 4:01CV79, 2002 WL 32588911, at *4 (E.D. Va. Mar. 20, 2002), aff'd, 37 F. App'x 645 (4th Cir. 2002) ("The Plaintiff cannot withstand summary judgment simply by alleging that he perceived an atmosphere of racism.") (citing Yarnevic v. Brink's, Inc., 102 F.3d 753, 757–58 (4th Cir. 1996) (stating that remote inferences and conclusory allegations cannot defeat summary judgment); Wheeler v. Travelers Cos., 866 F.Supp. 268, 271–72 (E.D.Va. 1994) (stating that speculative allegations are legally insufficient to establish pretext for racial discrimination)); Zanganah v. Council of Co-Owners of Fountains Condo., Inc., No. 1:10CV219 LMB/JFA, 2010 WL 5113637, at *8 (E.D. Va. Dec. 8, 2010) ("Courts in the Fourth Circuit have consistently held that mere disagreement with the facts supporting an employee's termination does not establish that the decision was a pretext for unlawful employment discrimination."); Sutherland v. Autumn Corp., 124 F. Supp. 2d 945, 947 (W.D.N.C. 2000), aff'd, 13 F. App'x 111 (4th Cir. 2001) ("Plaintiff has put forth no evidence upon which a reasonable jury could find

24

in his favor. He argues that other employees who violated the overtime policy were not fired but offers no evidence to support his allegation.").[13]

### 4. Retaliation

Plaintiff again alleges that Ms. DeWyse's actions were promptly reported to the company, which "failed to investigate or take action" and instead "deliberately sought to deny [her] critical financial relief by blocking [her] unemployment benefits." Doc. 1-1 at 14. During the hearing, Plaintiff argued that her last conversation with Ms. DeWyse (the April 23 Chat Message) as well as the April 23 Email were protected activities.

A former employee may bring a retaliation claim under Title VII for post-employment conduct. See Ream v. Pennsylvania Dep't of Human Servs./Polk Ctr., No. 1:16-CV-173 (BJR), 2017 WL 5626197, at *3 (W.D. Pa. Nov. 22, 2017), aff'd sub nom Ream v. Pennsylvania Dep't of Human Servs., Polk Ctr., 738 F. App'x 83 (3d Cir. 2018) (citing Robinson v. Shell Oil Co., 519 U.S. 337, 346 (1997)) ("The anti-retaliation provisions of Title VII provide former employees with a legal recourse against post-employment retaliation."); see also Haburn v. Petroleum Marketers, Inc., No. CIV. A. 707CV00240, 2007 WL 4269064, at *5, n.6 (W.D. Va. Nov. 29, 2007) ("The court notes that in Robinson v. Shell Oil

_____

[13] The question before the Court is whether Plaintiff can demonstrate that her termination was racially motivated. The Court does not otherwise need to determine why Carolina Hearing terminated Plaintiff's employment or whether she was entitled to unemployment benefits.

Co., 519 U.S. 337, 345-346, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997), the United States Supreme Court held that post-employment retaliation against a former employee is actionable under Title VII.").

"In order to establish a prima facie case for retaliation, a plaintiff must show that 1) they engaged in a protected activity, 2) they suffered an adverse employment action and 3) there was a causal link between the protected activity and the adverse employment action." Abadi v. Mecklenburg Cnty. Gov't, No. 3:17-CV-00435-FDW-DCK, 2019 WL 2546732, at *2 (W.D.N.C. June 20, 2019) (citing Coleman v. Md. Court of Appeals, 626 F.3d 187, 190 (4th Cir. 2010)).

"Protected activities fall into two distinct categories: participation or opposition. An employer may not retaliate against an employee for participating in an ongoing investigation or proceeding under Title VII, nor may the employer take adverse employment action against an employee for opposing discriminatory practices in the workplace." Laughlin v. Metro. Washington Airports Auth., 149 F.3d 253, 259 (4th Cir. 1998) (citing 42 U.S.C.A. § 2000e–3(a)).

Plaintiff has not alleged that she opposed discriminatory practices in the workplace or participated in an ongoing investigation or proceeding under Title VII. Significantly, neither the April 23 Chat Message nor the April 23 Email reference any discrimination, Plaintiff's participation in an ongoing Title VII

26

investigation or proceeding, or Plaintiff's opposition to a discriminatory practice in the workplace Rather, both the April 23 Chat Message and April 23 Email focused on Plaintiff's defense of her job performance.

Further, in the April 23 Email, Plaintiff herself appeared to believe that her termination was due to personal factors affecting Ms. DeWyse rather than anything to do with Plaintiff's race or color.

Therefore, summary judgment is also appropriate as to this claim. See Betourney v. GKN Driveline Newton, LLC, No. 5:17-CV-00221-KDB-DSC, 2019 WL 2881558, at *5 (W.D.N.C. July 1, 2019) (granting summary judgment on retaliation claim and explaining that "[c]omplaining about conduct that is outside of the scope of Title VII does not constitute 'opposition' protected activity.") (internal citation omitted); see also Bonds v. Leavitt, 629 F.3d 369, 384 (4th Cir. 2011) ("Title VII is not a general bad acts statute, however, and it does not prohibit private employers from retaliating against an employee based on her opposition to discriminatory practices that are outside the scope of Title VII"); Cosby v. S.C. Prob., Parole & Pardon Servs., 93 F.4th 707, 719 (4th Cir. 2024) ("[T]he plaintiff must point to specific evidence in the record from which a jury could infer that a reasonable person in the plaintiff's shoes would have 'belie[ved] that her complaints related to an ongoing Title VII violation.'") (citation omitted); Robbins v. Rowan Vocational Opportunities, Inc., No. 1:16CV310, 2018 WL 2338795, at *8 (M.D.N.C. May 23, 2018)

("Because Plaintiff has made no evidentiary showing that her May 2015 grievance concerned discrimination based on race, or any other impermissible ground precluded by Title VII, the Court concludes that this act does not constitute a protected activity.") (citing McNair v. Comp. Data Sys., Inc., No. 98–1110, 1999 WL 30959, at *5 (4th Cir. Jan. 26, 1999) (explaining that while Title VII's opposition clause protects an employee's opposition to "employment practices made unlawful by Title VII," it does not protect opposition "to all unlawful employment practices nor to practices the employee simply thinks are somehow unfair"); Harris v. Md. House of Corr., 209 F. Supp. 2d 565, 570 (D. Md. 2002) (finding that plaintiff did not engage in protected activity when she "merely complained of the unfair manner in which her superiors had treated her")).

### B. 42 U.S.C. § 1981 Claim

#### 1. Against Rob Schultz and Michele Schultz

"Section 1981 provides, in relevant part, that 'all persons ... shall have the same right ... to make and enforce contracts ... as is enjoyed by white citizens,' and guards generally against race-based discrimination in the workplace." Lemon v. Myers Bigel, P.A., 985 F.3d 392, 399 (4th Cir. 2021) (alterations in original) (quoting 42 U.S.C. § 1981). "[A] claim for individual liability under § 1981 'must be predicated on the actor's personal involvement.'" Marshall v. C & S Rail Servs., LLC, No. 1:19CV986, 2021 WL

1341801, at *6 (M.D.N.C. Apr. 9, 2021) (quoting Hawthorne v. Va. State Univ., 568 F. App'x 203, 204-05 (4th Cir. 2014)); see also Benjamin v. Sparks, 173 F. Supp. 3d 272, 283 (E.D.N.C. 2016) ("[Section 1981] imposes liability on an individual only for his or her own intentional actions that caused an infringement of [S]ection 1981.").

During the hearing, Plaintiff was asked about the personal involvement of Rob Schultz and Michele Schultz in the events that form the basis of her Section 1981 claim. Plaintiff explained that Ms. DeWyse "discussed it" with Michele Schultz before Plaintiff was terminated and that Plaintiff requested that both Rob Schultz and Michele Schultz investigate her claims (as set out in the April 23 Email) but that "nothing was done."

The record, though, does not indicate that either Rob Schultz or Michele Schultz were personally involved in any intentional discrimination regarding Plaintiff.

### 2. Prima Facie Case

"A prima facie retaliation claim under 42 U.S.C. § 1981 has the same elements [as a claim for retaliation in violation of Title VII]." Boyer-Liberto v. Fontainebleau Corp., 786 F.3d 264, 281 (4th Cir. 2015) (internal citations omitted); see also Pettis v. Nottoway Cnty. Sch. Bd., 592 F. App'x 158, 160 (4th Cir. 2014) (concluding that plaintiff's "vague complaints of harassment are not protected activity" for purposes of either Title VII or Section 1981 and

explaining that "[p]rotected activity includes both participation and opposition activity"); Bryant v. Aiken Reg'l Med. Centers Inc., 333 F.3d 536, 543 (4th Cir. 2003) (explaining that plaintiff "clearly engaged in protected activity" for purposes of both Title VII and Section 1981 based on plaintiff's opposition to an "unlawful employment practice" under Title VII).

Here, summary judgment is appropriate with respect to Plaintiff's Section 1981 claim for the same reasons summary judgment is appropriate with respect to Plaintiff's claim of retaliation under Title VII. See Shung-Lung Chao v. Int'l Bus. Machines Corp., No. 5:09-CV-77-BO, 2010 WL 2465234, at *4 (E.D.N.C. June 15, 2010), aff'd sub nom. Shun-Lung Chao v. Int'l Bus. Machines Corp., 424 F. App'x 259 (4th Cir. 2011) ("Again, there is no question that Plaintiff suffered an adverse employment action. Plaintiff contends that he engaged in protected activity by complaining of 'unfair treatment' after receiving his year-end performance evaluation on January 22, 2008. Specifically, Plaintiff wrote in the employee comments section of his evaluation, 'I disagree with the overall assessment and rating given by my manager and believe I am the victim of unfair treatment.' This statement, however, does not constitute 'protected activity' sufficient to support a claim for unlawful retaliation under Title VII or 42 U.S.C. § 1981") (citing Harris–Childs v. Medco Health Solutions of Tex. LLC, 169 Fed. Appx. 913, 916 (5th Cir. March 13, 2006) (plaintiff could not show engagement in a protected

activity, as her complaints of "unfair treatment" and harassment did not "put the employer on notice that her complaint was based on racial or sexual discrimination")).

### C. N.C.G.S. § 96-18

During the hearing, Plaintiff acknowledged that N.C.G.S. § 96-18 does not create a private right of action. See also Howard v. Food Lion, Inc., 232 F. Supp. 2d 585, 599 (M.D.N.C. 2002) ("In the opening paragraph of the complaint, Plaintiff invokes North Carolina General Statute § 96–18(b). This section subjects to criminal sanction employers who make false statements that prevent an entitled person from receiving unemployment benefits. Because the statute does not create a private right of action, however, the Food Lion Defendants' Motion to Dismiss Plaintiff's claim will be granted.").[14] Consequently, this claim will also be dismissed.

### V. Order

For the reasons set forth herein, Defendants' Motion for Summary Judgment (Doc. 28) is **GRANTED**, and Plaintiff's Complaint is **DISMISSED**.

---

[14] Plaintiff argued, however, that Defendants' participation in the proceedings before the NCDES constituted retaliation for Plaintiff's April 23 Email. Plaintiff, however, has presented no evidence to support that position.

The Clerk is **RESPECTFULLY DIRECTED** to enter a judgment consistent with this Memorandum of Decision and Order contemporaneously herewith.

It is so ordered.

Signed: March 13, 2026

W. Carleton Metcalf
United States Magistrate Judge